# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF ILLINOIS
### PEORIA DIVISION

| | |
|---|---|
| KIMMIE JO CHRISTIANSON )<br>)<br>    Plaintiff, )<br>)<br>v. )<br>)<br>HENRY HOLT AND COMPANY, LLC; )<br>MAGNUM PHOTOS, Inc.; BARBARA )<br>EHRENREICH, )<br>)<br>    Defendant. ) | No. 06-cv-1156 |

## O P I N I O N   A N D   O R D E R

Before the Court are Defendants' Motion to Stay Discovery [Doc. 50], Defendants' Motion to Dismiss [Doc. 52], Defendants' Motion for Reconsideration [Doc. 54] and Defendants' Motion for an Interlocutory Appeal [Doc. 56] all of which were filed on April 3, 2007. Each of the Motions contains an accompanying Memorandum. [Docs. 51, 53, 55, & 57.] Plaintiff filed four Responses [Doc. 58, 59, 60, & 61] to the pending Motions on April 12, 2007. For the following reasons, Defendants' Motion for Reconsideration, and Defendants' Motion for an Interlocutory Appeal are DENIED. And, Defendants' Motion to Dismiss and Defendants' Motion to Stay are GRANTED IN PART and DENIED IN PART.

**I.**
**BACKGROUND**

As described in this Court's previous order, Defendants are the publisher, photographer and author of the best selling book Nickel and Dimed: On (Not) Getting By in America ("Nickel and Dimed"). Nickel and Dimed is Barbara Ehrenreich's compelling account of her travels across America, personally working many hours in various low paying jobs. Ehrenreich visited various cities and worked for a cleaning service, stocked products at Wal-Mart, and waited tables; and, her book tells of how a living wage is unattainable in these low paying jobs. She presents America's working poor in a world separated from the educated elite in which it is emotionally and physically draining to earn a meager living on minimum wage and impossible to actually advance in life. However, to clarify, Ehrenreich does not do any of these jobs for a living. She was simply doing a study and in reality she is an author and an academic.

Christianson, on the other hand, is, or at least was, a waitress in Peoria, Illinois. In 1986, a photographer for Magnum Photos approached Christianson and asked her if she and her children were willing to be photo subjects for a Fortune magazine article on single mothers supporting their families on low-wage jobs. Christianson agreed.

The photographer took several photographs. One particular shot is of Christianson, dressed in her uniform as a waitress, standing at the counter of a small restaurant, waiting to pick up an order and looking back over her shoulder. The photo is both gripping and appears to emit all the ideas of hard work, worry and concern that Ehrenreich sought to capture in her book.

The photo eventually made it into <u>Fortune</u> and was part of their May 1986 issue. Christianson only gave her consent for her image to be used in the <u>Fortune</u> article. However, in 2001 <u>Nickel and Dimed</u> was published, and there, right on the cover, was the same photo of Christianson looking over her shoulder.

The book was a New York Times best seller and has gone on to be published throughout the world. There is a play based on the book and it appears that there is a forthcoming movie. Meanwhile, Christianson reared four children as a waitress and has not read a book since the 1970s.

Christianson, however, did not bring her claim for approximately five years from the initial date of publication. On June 23, 2006, Christianson, with her attorney, brought suit for invasion of Christianson's right to privacy and brought a claim under the Illinois Right of Publicity Act ("IRPA"). 765 ILCS 1075. The lawsuit "seeks damages for appropriation of another's name or likeness where the defendants have used

plaintiff's image for commercial purposes and benefit without her consent." (Doc. 24 at 2.)

Defendants filed a Motion to Dismiss (Doc. 38) which was denied by this Court. The Order denying the Motion to Dismiss was followed by the Motions currently before the Court. These Motions will be addressed in the following order: (1) Defendants' Motion for Reconsideration; (2) Defendants' Motion to Dismiss; (3) Defendants' Motion for an Interlocutory Appeal; and finally, (4) Defendants' Motion to Stay Discovery.

## II.
## ANALYSIS

### A. Motion for Reconsideration

In this Court's previous Order (Doc. 48) denying the previous Motion to Dismiss (Doc. 38), this Court addressed three issues: (1) Whether republication tolled the applicable statute of limitations; (2) Whether Plaintiff's claim was preempted by federal copyright law; and (3) Whether the First Amendment bars Plaintiff's claim. The Court held that (1) discovery was required to address the statute of limitations; (2) Plaintiff's claim was not preempted by federal copyright law; and (3) the First Amendment did not bar Plaintiff's claim.

Now, Defendants have filed a Motion to Reconsider in which they challenge this Court's ruling on their tertiary First Amendment argument.

A motion to reconsider can be viewed as either a motion to alter or amend a judgment under Federal Rule of Civil Procedure 59(e) or a motion for relief from judgment under Federal Rule of Civil Procedure 60(b). Either way, it serves one of two limited functions: either (1) correcting a manifest error of law or fact; or (2) giving a party an opportunity to present newly discovered evidence. Caisse Nationale de Credit Agricole v. CBI Indus., 90 F.3d 1264, 1269 (7th Cir. 1996).

Defendants expand upon their previous First Amendment argument. Specifically, Defendants argue that the First Amendment creates an absolute bar against any appropriation of likeness claim when the misappropriated likeness is presented on the cover of a book.

The right of publicity, in Illinois, is "[t]he right to control and to choose whether and how to use an individual's identity for commercial purposes...." 765 ILCS 1075/10 (1999). In Illinois, under the IRPA, "[a] person may not use an individual's identity for commercial purposes during the individual's lifetime without having obtained previous written consent...." 765 ILCS 1075/30. Plaintiffs in Illinois have been able to bring suit under this statute in a variety of situations. For example, a well published author who appeared on hundreds of infomercials could protect against the use of his image on a website that promoted products that he never

5

consented to endorsing. Trudeau v. Lanoue, No. 04 C 7165, 2006 WL 516579 (N.D.Ill. March 2, 2006). Or, individuals who were photographed riding a roller coaster at an amusement park could protect against the unauthorized use of their image on a television box. Leto v. RCA Corp., 341 F.Supp.2d 1001 (N.D.Ill. 2004).

On the other hand, the First Amendment (applied to the states through the Fourteenth Amendment) puts up a bar against laws "...abridging the freedom of speech...." U.S. Const. Amend. I. Inevitably, the Right of Publicity can conflict with the First Amendment when an individual's identity is used by another in an artistic or creative expression. The IRPA recognizes the serious First Amendment implications inherent in regulating artistic and creative expression. Collier v. Murphy, No. 02 C 2121, 2003 WL 1606637 *2 (N.D.Ill. 2003). As a result, the Statute has carved out an exception to the Right of Publicity and states that the Right of Publicity does not apply to "use of an individual's identity in an attempt to portray, describe, or impersonate *that individual* in a live performance, a single and original work of fine art, play [or] book...." 765 ILCS 1075/35(b)(emphasis added).

The case at bar does not fall within this statutory exception because the creative work in question did not attempt to portray, describe, or impersonate *that individual*. Namely,

6

the book in question, Nickled and Dimed, did not attempt to portray, describe or impersonate Plaintiff.  If Plaintiff had been even mentioned in Nickled and Dimed, then her cause of action might fit within this exception and her claim under the IRPA could be barred.

In addition, the Statute also exempts a claim against the "use of an individual's identity for non-commercial purposes, including any news, public affairs, or sports broadcast or account...."  765 ILCS 1075(b)(2).  As noted in this Court's previous order, the content of the book, Nickled and Dimed, is non-commercial speech that focuses on public affairs.  Once again, if Plaintiff's identity was incorporated into that non-commercial speech, then her claim would fall within this exception.  However, Plaintiff is not mentioned in the book.  As a result, it follows that the purpose of her image is not to reflect the subject matter of the book, but instead to reflect the ideas of the book in such a way that it catches the eye of a prospective customer and leads to a possible sale.[1]

---

[1] Neither party appears to grasp what makes the use of Plaintiff's image in this case commercial.  The fact that a book is sold does not make the speech it contains commercial in nature.  Murphy, 2003 WL 1606637 at *2.

Instead, the dichotomy can best be understood by looking at the parallel roles of an author and a publisher.  In their simplest forms, an author's role is to put a story to paper while a publisher's role is to sell the story to the public.  The book jacket, when it depicts a part of the story, can fit within the author's role of telling a story.  However, in the

However, the fact that Plaintiff's claim does not fit within one of the elucidated exception to the IRPA does end the inquiry.  Defendants argue, based upon case law from other jurisdictions, that the First Amendment poses an absolute bar to any misappropriation action for the use of an image on the cover of a book.

Under the applicable law, a party cannot take someone's image and use it on the packaging of, for instance, a hair care product, without being subject to a right of publicity claim. <u>See</u>, <u>e.g.</u> <u>Toney v. L'Oreal</u>, 406 F.3d 905 (7th Cir. 2005).  Under the legal framework envisioned by Defendants, a publisher could take the same image and use it on a book jacket without concerning themselves with acquiring the individual's permission.  Defendants envision a world where a publisher can troll any medium for any individual's personal image and use that image on the packaging for their publication - free from the constraints that are faced by every distributor of every other product.  This Court does not interpret the law as envisioned by Defendants.

---

case at bar, the photo does not any depict part of the story of Ms. Ehrenreich's personal journey.  Neither, Plaintiff nor the restaurant where she appears are ever mentioned in the story.  As a result, the photo does not fit with the author's role of telling the story.  It follows instead that this gripping photograph that calls attention to the book fits within the publisher's role of selling the book.

When it comes to the use of an individual's image on the cover of a book, the case law reflects a strong First Amendment interest in allowing authors and publishers to use images that reflect the free speech contained in a book.  Typically, an individual (often an individual in the public eye) is the subject in a book, and if they bring a right of publicity action for the use of their image on the book jacket, the claim is barred because the portrayal, description or impersonation of the individual is part of the creative or newsworthy expression.  See, e.g. William O'Neil & Co., Inc. v. Vaidea.com Inc., 202 F.Supp.2d 1113 (C.D.Cal. 2002).  As one would expect, when a photo is on the cover of a book, at least part of the photo is mentioned in the book.  As a result, in each of the cases involving book jackets noted by the parties, a plaintiff's claim was barred by the First Amendment.  For instance, if an individual appeared in a photo with a companion, and the companion was the subject of the book then the individual would not have a viable claim.  Dallesandro v. Henry Holt & Co., 4 A.D.2d 470 (N.Y.App.Div. 1957).  Or, if an individual appeared in a parade, and the parade was discussed in a magazine[2] then they would not have a viable claim.  Murray v. New York Magazine

---

[2] In addition, the dissent in Dallesando specifically pointed out that magazines and newspapers are entitled to special latitude in the allowable area of picturization.  The dissent compellingly argued that this special latitude should not be extended to books.  Dallesandro, at 472 (Peck, P.J. dissenting).

9

Co., 27 N.Y.2d 406 (N.Y.App. 1971).  Or, if an individual appeared in a photo engaged in a newsworthy public activity such as boxing, even if they were not discussed in the book, the individual would not have a viable claim.  Oma v. Hillman Periodicals, Inc., 281 A.D. 240, 244 (N.Y.App.Div. 1953).

   Plaintiff cites each of these cases in an attempt to get this Court to adopt an absolute bar.  However, each of these cases follows the typical pattern – the author discusses various subjects within the work and at least one of those subjects appears in the photo on the cover of the work.  As one would expect, in the vast majority of cases when an individual appears on the cover of a book they, or something in the photograph, is mentioned within the book.  As a result, in each of the relevant cases cited by the parties, a plaintiff was unable to bring an action for the use of their image on a book cover.  However, none of these cases puts up an absolute bar to a right of publicity claim for the use of an image on the cover of a book and each of these cases emphasizes the relationship between the subject matter of the book and the subject matter on the cover of the book.  In particular, the court in Murray emphasized that the magazine article discussed the parade and only denied the plaintiff's claim because, unlike in this case, the photo bore a "reasonable relationship" to the "subject matter contained in the article."  Murray, 27 N.Y.2d at 409.

The one exception is the case at bar. Here, the subject matter of the book is Barbara Ehrenreich's personal journey from one part of the country to another working at various low paying jobs.  For whatever reason, Ehrenreich's photo was not used on the book cover and either the publisher or the author chose Plaintiff's image instead.  The photograph and the book both concern the plight of the working poor in America, but they do not have any overlapping subject matter.[3]  At no point is Plaintiff, her photo, or the restaurant where she appears ever part of the subject matter of the book.  If Plaintiff or the restaurant where she appears had been mentioned even once in <u>Nickled and Dimed</u> then this Court might have doubts about this

---

[3]   Once again, Defendants do not seem to grasp the distinction noted by the Court.  The fact that both the book and the photograph at issue concern similar ideas regarding the working poor does not mean that the use of the image fits within the author's protected speech.  For instance, if the publishers of the novel <u>The Color Purple</u> used a personal image of a random African-American woman who appeared downtrodden for the cover of the novel, the misuse of that private image would not be protected simply because both the image and the novel both concerned the plight of African-American women in America. Alice Walker, <u>The Color Purple</u>, Harcourt Trade Publishers (1982).  If however, an author crafted a non-fictional account, documenting the life of that specific African-American woman, then the picture and the speech would have overlapping subject matter and the use of the image would be protected by the First Amendment.

ruling.  But this is not the case, and as a result, the book and the photo do not bear a reasonable relationship with each other.[4]

Furthermore, even if the Court agreed with Defendants that there should be an absolute bar to appropriation of likeness claims for use of an image on the cover of a book, Plaintiff's claim in this case would not be barred.

Previously, this Court addressed the statute of limitations issue in this Court's previous Order.  (Doc. 48 at 6-7.)  There, the Court noted that Plaintiff alleges that her image was used

---

[4]  Defendants also argue that a book jacket itself can be viewed as an independent work of art, like a painting, entitled to First Amendment protection even when separated from the text of the book.  Specifically, Defendants argue that a secondary source previously cited by this Court emphasizes that a book cover can be an independent work.  (Doc. 48 at 13; citing Ned Drew, Paul Sternberger, By its Cover: Modern American Book Design, Princeton Architectural Press (2005).)  Defendants are correct that this secondary source lacks precedential force. (Doc. 55 at 3.)  However, this publication, as well as others, recognizes that the salient purpose of a book cover is commercial:
> "Book jackets began to gain importance in the 1890's with the recognition that they could be a way to attract the attention of potential buyers.... By the end of the first decade of the twentieth century, the book jacket began to take root as a promotional tool.... [In more recent times t]he jacket was understood to be an ephemeral utilitarian protective device and odious marketing necessity whose useful purpose was all but depleted when the book was purchased by the consumer." Id. at 20.  Furthermore, "[w]ith more than 50 percent of book-purchasing decisions made at the bookshelf (as opposed to predetermined by the customer before they came into the store) [a] jacket's selling power is essential" to an author that wishes to boost sales of her book. Jacqueline Deval, Publicize Your Book!, 70 The Berkley Publishing Group (2003).

to promote a play based upon the book and a forthcoming movie. (Doc. 49 ¶ 38; Doc. 47 Ex. A.)  As a result, the Court allowed the case to proceed through discovery before addressing the applicable statute of limitations.

Plaintiff's allegation that her image was used to promote other products is also applicable to the issue currently before the Court.  Even if this Court adopted an absolute bar allowing a publisher to use any image on the cover of a book, Plaintiff's claim could still proceed because discovery could reveal that Plaintiff's image has been used to advertise these separate products.  (Doc. 47 at Ex. A.)[5]  The use of Plaintiff's image promoting separate products would not fall under Defendants' broad interpretation of First Amendment protection because Plaintiff's image, in this context, would not be connected to the text of the book.  Instead, the image is separated, both physically and metaphysically, from the protected speech and has a purely commercial purpose.

Accordingly, the Court's previous Order does not contain any error, let alone a manifest error worthy of reconsidering

---

[5] Plaintiff does not need to specifically allege such facts but instead must only make allegations from which the Court could reasonably infer that such facts are in existence. <u>Vincent v. City Colleges of Chicago</u>, 485 F.3d 919 (7th Cir. 2007)("the possibility that facts to be adduced later, and consistent with the complaint, could prove the claim, is enough for the litigation to move forward.").

Defendants' Motion to Dismiss. As a result, Defendants' Motion to Reconsider (Doc. 54) is DENIED.

### B. Defendants' Motion to Dismiss

Defendants have also filed a new Motion to Dismiss. (Doc. 52.) Defendants argue first that Plaintiff's common law claim for invasion of privacy (Count I) has been completely supplanted under Illinois law by the IRPA. Secondly, Defendants restate their arguments from their previous Motion to Dismiss which was ruled on by this Court. In Response (Doc. 60), Plaintiff restates her arguments addressing the previous Motion to Dismiss, but does not address whether her common law claim for invasion of privacy has been completely supplanted by the IRPA.

The Court need not restate the reasons for rejecting Defendants' previous arguments that were already disposed of in the Court's previous Order. (Doc. 48.) However, the Court will address Defendant's argument that the common law claim for misappropriation of likeness has been supplanted by the IRPA.

The common law tort of appropriation of someone's name or likeness ceased to exist for action that accrued after January 1, 1999 (the date that the IRPA became effective). Blair v. Nevada Landing Partnership, 859 N.E.2d 1188, 1992 (Ill. App. 2nd 2006). Instead, these rights were completely supplanted by the IRPA. Id.

In the case at bar, Count I is labeled "Invasion of Privacy." However, Count I specifically seeks damages because the "defendants, without knowledge or consent of Christianson, appropriated for commercial purposes for the pecuniary gain of the defendant [sic], the photographic image and likeness of Christianson." (Doc. 49 at ¶ 34.) This allegation, while labeled "Invasion of Privacy" is a claim for the misappropriation of Plaintiff's likeness. Plaintiff does not put forward any argument as to why this allegation should not be construed as an appropriation of likeness claim, nor does Plaintiff argue that this common law tort has not been supplanted by the IRPA.

Accordingly, Defendants' Motion to Dismiss is GRANTED IN PART and DENIED IN PART. Plaintiff's claim for "Invasion of Privacy" (Count I) is DISMISSED.

**C. Defendants' Motion for an Interlocutory Appeal**

Defendants request an interlocutory appeal pursuant to 28 U.S.C. § 1292(b).

A district court may grant an interlocutory appeal of an order when the district court finds that the order involves (1) a controlling question of law; (2) as to which there is substantial ground for difference of opinion; and (3) immediate appeal from the order may materially advance the ultimate termination of the litigation. 28 U.S.C. § 1292(b).

Defendants first argue that there is substantial difference of opinion regarding the First Amendment issue and restates much of the arguments already addressed. In particular, Defendants emphasize the holding in Murray, 27 N.Y.2d 406. In Murray a plaintiff appeared on a magazine cover dressed in typical Irish garb at a St. Patrick's Day Parade in Manhattan. The magazine was featuring an article on Irish immigrants and the plaintiff sued for the use of his likeness on the cover of the magazine. In dismissing the suit, the court noted the overlapping subject matter and emphasized that the parade was discussed in the article. Id. at 409. If the photo had not had any overlapping subject matter and did not bear a reasonable relationship with the contents of the article, then implicitly the case would have come out differently.

In the case at bar, Plaintiff appears in the photo working in a restaurant, but the restaurant is never mentioned in the book itself. Accordingly, the facts at bar call for a different outcome.

Furthermore, Defendants have not brought forward a single case where, as here, nothing and no one in the photo is mentioned in the book. As a result, there is not any basis in the relevant case law for substantial grounds for a difference of opinion regarding the matter at bar.

Defendants further argue that this Court's order will have a chilling effect for publishers in Illinois.  Specifically, publishers concerned about running afoul of this Court's Order will unnecessarily alter their behavior with respect to cover art distributed in Illinois, producing a chilling effect counter to First Amendment interests. (Doc. 57 at 2.) The Court disagrees.

One can hardly imagine the publishers are in the habit of placing photos of individuals on the covers of their publications without permission.  Furthermore, it is even more unlikely that publishers are in the habit of using photos of individuals who go unmentioned within a book.  This Court is not requiring publishers to get the permission of every individual who is incidentally in a larger photograph.  Instead, this Order follows the law as suggested by <u>Murray</u> and dissuades publishers from using random personal images of individuals that have no overlapping subject matter with the content of a book on the packaging of their product.

Finally, Defendants argue that the immediate appeal of this Order may materially advance the ultimate termination of the litigation.  In particular, Defendants protest against the burden of discovery that they could face if this litigation moved forward.

However, as already noted, the statute of limitations could very well be dispositive of the case at bar.  A burdensome appeal would be unnecessary if this case can be disposed of on the fairly straightforward issue such as the statute of limitations.  As a result, an interlocutory appeal could unnecessarily add to the length of this litigation.  See, e.g. Fairley v. Fermaint, 482 F.3d 897 (7th Cir. 2007)(Appellate Court declined to address statute of limitations issue when an interlocutory appeal was granted to address a separate issue).

As a result, the immediate appeal of this Court's Order would not materially advance the ultimate termination of the litigation.  Accordingly, Defendants' Motion for an Interlocutory Appeal is DENIED.

### D. Defendants' Motion to Stay Discovery

Defendants first seek to stay discovery while this Court address the Motions addressed above.  These Motions have now been addressed so this request is moot.

Next, Defendants seek to limit initial discovery to the issue regarding the statute of limitations.  In response, Plaintiff point out that the only remaining issue requiring discovery besides the statute of limitations is damages.

Federal Rule of Civil Procedure 26(b)(2)(C) states that a court "must limit the frequency or extent of discovery otherwise allowed by these rules... if it determines that :

18

  (i)  the discovery sought is unreasonably cumulative or duplicative, or is obtainable from some other source that is more convenient, less burdensome, or less expensive;

  (ii)  the party seeking discovery has had ample opportunity by discovery in the action to obtain the information sought; or

  (iii)  the burden or expense of the proposed discovery outweighs its likely benefit, taking into account the needs of the case, the amount in controversy, the parties' resources, the importance of the issues at stake in the litigation, and the importance of the proposed discovery in resolving the issues.

As already noted, the statute of limitations is a fairly straightforward issue that could be dispositive of the case. Furthermore, evidence regarding damages and other issues could be quite extensive and will likely involve what percentage of the profits of the book were "derived from the unauthorized use" of the Plaintiff's image. 765 ILCS 1075/40. As a result, the burden or expense of the proposed discovery will likely outweigh the benefits until the statute of limitations is resolved.

As a result, Defendants' Motion to Stay is GRANTED IN PART and DENIED IN PART; initial discovery is limited to the statute of limitations question.

## III.
## CONCLUSION

IT IS THEREFORE ORDERED that Defendants' Motion to Reconsider (Doc. 54) is DENIED.  Defendants' Motion to Dismiss (Doc. 52) and Defendants' Motion to Stay (Doc. 50) are GRANTED IN PART and DENIED IN PART.  And, Defendants' Motion for an Interlocutory Appeal (Doc. 56) is DENIED.

ENTERED this  29th  day of June, 2007.

                                                  s/ Joe Billy McDade  
                                                      Joe Billy McDade  
                                        United States District Judge